**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARY LEE GENAO, | Civil Action No. 2:10-cv-04156 (SDW) |
| Plaintiff, | |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | May 23, 2011 |

**Wigenton, District Judge,**

Before the Court is Plaintiff Mary Lee Genao's appeal of the final administrative decision of the Commissioner of the Social Security Administration ("Commissioner"), with respect to Administrative Law Judge James Andres's ("ALJ") denial of Genao's claim for disability insurance benefits ("DIB") under Sections 216(i), 223(d) and supplemental security income ("SSI") under Section 1614(a)(3)(A) of the Social Security Act (the "Act").

This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. The Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons stated herein, this Court AFFIRMS the Commissioner's decision.

**PROCEDURAL AND PERSONAL BACKGROUND**

On August 8, 2007, Genao applied for DIB and SSI. (ALJ's Decision at 1.) Her claims were denied on March 19, 2008, and again upon reconsideration on June 6, 2008. (*Id.*) Genao requested a hearing that was held on September 15, 2009 before the ALJ, (*id.*), who issued a ruling against Genao on October 26, 2009. (ALJ's Decision at 11.) Subsequently, the Appeals

Council denied Genao's request for review.  (AC Denial at 1.)  Thereafter, Genao filed this appeal with the Court.  (Compl. 1, Aug. 13, 2010.)

## A.      Employment History

Mary Lee Genao was born on July 5, 1974.  (Tr. 3.)  She holds a post-secondary degree in "Executive Secretarial" from the Kathryn Gibb School in Piscataway, New Jersey.  (Tr. 3.) Her degree is similar to a business degree.  (Tr. 3.)

From 2001 until 2003, Genao worked as a diagnostic scheduling secretary at the Community Hospital Group, Inc. (Ex. 1E at 3; Ex. 3D at 4-5.)  From October 2003 until October 2004, she worked as a customer service representative for a wireless communications company. (Ex. 1E at 3.)  She worked as an accounting clerk and secretary with a secretarial temporary agency from January 2005 until May 2005.  (Ex. 1E at 3; Ex. 9E at 1.)  Genao's most recent employment was as a head distribution clerk for Coca Cola Enterprises, Inc.  ("Coca Cola") from October 2005 until April 2007.  (Ex. 3D at 5-6; Ex. 9E at 1.)

As the head distribution clerk for Coca Cola, Genao "filed papers, completed reports, answered phones, drove to drivers for assistance with handhelds, drove to customers for signature of delivery papers."  (Ex. 9E at 2.)  At Coca Cola, Genao's responsibilities included using machinery and tools, technical skills and writing reports.  (*Id.*)  She walked for two hours each day, stood for one hour per day, sat for four hours each day and stooped for one hour per day.  (*Id.*)  The job did not require Genao to lift more than ten pounds.  (*Id.*)  In her previous job at the temporary agency, her duties included a variety of clerical work such as answering the phones, processing reports and entering orders.  (Ex. 9E at 3.)

## B.      Medical History

Genao claims her disability began on November 5, 2006, just before she was admitted to

2

the hospital for abdominal pain and diarrhea.  (ALJ's Decision at 1; Ex. 12F at 1.)  At her

hearing, Genao alleged disability due to migraines, fibromyalgia, gastrointestinal problems,

syncope, vertigo, a herniated disc, depression, sleep apnea and epilepsy.[1]  (Tr. 4-14, 18.)  In her

DIB application, she claimed disability due to seizure disorder (epilepsy), gastrointestinal

problems, asthma, thyroid and high blood pressure.  (Ex. 1E at 2.)  Genao has a past medical

history that includes seizure disorder, hypertension, asthma, gastroesophageal reflux disease,

multiple miscarriages and a history of migraines.  (Ex. 14F at 6; Ex. 17F at 4, 7; Ex. 18F at 4, 21;

Ex. 25F at 1.)  Her past surgical history includes two ectopic pregnancies, an appendectomy,

gallbladder surgery and an ovarian cyst.  (Ex. 6F at 1; Ex. 14F at 6; Ex. 17F at 4, 7; Ex. 18F at 4,

21; Ex. 25F at 1.)

      Genao alleges she is taking several medications due to her numerous medical problems.

She is taking 125 milligrams of Depakote and 50 milligrams of Imitrex for her seizures and

migraine headaches respectively.  (Tr. 9, 15-17.)  For high blood pressure, Genao is taking 10

milligrams of Amlodipine.  (Tr. 16.)  She is also taking an unspecified dosage of Fioricet daily

and 300 milligrams of Lyrica for her fibromyalgia.  (Tr. 16-17.)  The side effect for Lyrica is

drowsiness.  (Tr. 17.)  Genao also uses Albuterol to control her asthma, Cymbalta for depression

and Lidoderm for her back pain.  (Tr. 17-18.)

      At her ALJ hearing, Genao's counsel opined, "the record is replete with seizures and

hospitalizations for seizures and syncopal episodes" in 2005 and 2006.  (Tr. 9.)  While Genao

claims her seizures began in November 2006, there is no record of her going to the hospital due

to a seizure.  (Tr. 21.)  She does see a neurologist, Dr. Farooq Rehman, M.D. ("Dr. Rehman") for

---

[1] This Court declines to review Genao's claim that the ALJ failed to consider her fibromyalgia,
sleep apnea and depression because Genao did not mention these impairments when she first
applied for disability.  (Ex. 1E at 2.)

her alleged seizure disorder.  (Tr. 22; Ex. 19F at 2.)  Genao stated that she has "just a form of epilepsy . . . and it makes [her] just [] pass out."  (Tr. 13.)  The most recently alleged seizures have occurred in February 2007, January 2008, April 2008 and August 2008. (Tr. 9-10; Ex. 8E at 1; Ex. 11E at 1.)  Genao maintains she takes 125 milligrams of Depakote daily for her seizures, which makes her sleepy.  (Tr. 9, 17.)  Genao says the medication helps her condition but she is still prone to collapsing.  (Tr. 11-12.)

However, Dr. Alan S. Lichtbroun, a rheumotologist Genao consults for her arthritic pain, noted that she "takes Depakote for epilepsy for the past four years but only takes it when she starts feeling nauseous and dizzy . . . [o]ne pill seems to prevent it.  She takes it every 2-3 weeks, not every day . . . ."  (Ex. 25F at 1.)  After her consultation with another specialist, Dr. Deborah Rosin wrote to Dr. Tomasz Grochowalski (who is Genao's treating physician) that her symptoms included falling and blacking out.  (Ex. 26F at 6.)  Dr. Rosin ruled out seizure and noted that the patient appeared to suffer from vertigo of an "unclear etiology."  (*Id.*)

On June 3, 2005, results from an electroencephalogram ("EEG"), which was done to monitor Genao's brain activity due to alleged epileptic seizures, were normal and no abnormalities were detected during the EEG.  (Ex. 8F at 2.)  On November 9, 2005, results from the electrodiagnostic study showed that the "[l]eft median and ulnar motor NCS study was normal"; the "[l]eft median, ulnar and radial sensory NCS was normal"; the "[l]eft median and ulnar F waves were normal "; and a "[n]eedle examination with monopolar needle of left upper limb was normal."  (Ex. 9F at 2.)

Nearly seven months after her first EEG, another test was done on January 6, 2006.  (Ex. 10F at 1.)  The EEG impression noted that there was "an abnormal EEG due to the presence of left temporal slowing and sharply contoured delta activity over the same region."  (*Id.*)  And, the

4

findings were "suggestive of left temporal lobe dysfunction but not as atypical.  The finding could potentially be epileptogenic."  (*Id.*)  However, Dr. Rehman ordered a magnetic resonance imaging ("MRI") that was taken on June 22, 2009; and the results from the test were normal. (Ex. 26F at 7.)

Genao was first hospitalized due to abdominal pain, syncope and asthma on May 20, 2005.  (Ex. 6F at 1.)  Genao experienced pain in her lower right abdomen, and her prognosis included an ovarian cyst, enterocolitis and syncopal episode.  (*Id.*)  She was also diagnosed with Irritable Bowel Syndrome.  (Ex. 8F at 3.)  Her condition improved "significantly, and she was discharged in stable condition . . . ."  (Ex. 6F at 1.)  During her hospitalization, a series of tests were done including a computerized axial tomography ("CT scan") of her abdomen, which "showed a tumor in her liver, a cyst in her ovary, and a fibroid uterus."  (Ex. 8F at 3.)  Genao also underwent an MRI, EEG and CT scan of her brain.  (*Id.*)  The June 3, 2005 EEG impression came back normal, "without any focal or epileptiform discharges."  (Ex. 8F at 2.)

On March 20, 2006, Genao was hospitalized again for abdominal pain due to an ectopic pregnancy.  (Ex. 11F at 2.)  Specifically, she was admitted for a ruptured ecoptic pregnancy in her fallopian tube.  (Ex. 11F at 17.)  This resulted in a surgery to remove her right fallopian tube. (*Id.*)  Her ovaries were not affected by the pregnancy and were in normal condition at the time of the surgery.  (*Id.*)

On November 7, 2006, Genao visited the emergency room due to abdominal pain and diarrhea.  (Ex. 12F at 1.)  A CT scan of her abdomen and the patient's liver, spleen, pancreas, adrenal glands, kidneys and bladder appeared fine.  (Ex. 12F at 12.)  A second CT scan was conducted later that same day, and the pelvic ultrasound was "unremarkable."  (Ex. 12F at 14.) On November 13, 2006, a biopsy was taken from her colon.  (Ex. 13F at 1-2.)  Except for a

finding of colitis, the biopsy came back normal.  (Ex. 13F at 2.)

On November 16, 2006, Genao was hospitalized for four days due to abdominal pain, mild gastritis and mild esophagitis.  (Ex. 14F at 1.)  Genao complained of lower right abdominal pain, nausea and vomiting.  (Ex. 14F at 1.)  She was discharged but doctors were not clear on the source of her abdominal pain.  (*Id.* at 2.)

On or around February 14, 2007, a discharge note from Dr. Jozsef Duhl stated, "no abnormality was found to suggest any major acute inflammatory pathology." (Ex. 20F at 23.) "Her basic hematology . . . were within normal limits."  (*Id.*)  "Her basic auto immune work up including all the markers previously mentioned was also negative."  (*Id.*)  "CT scan of the abdomen and pelvis which was done on night one, mainly being concerned of an acute surgical abdomen, showed essentially just an anteverted uterus and some physiological looking small cysts in the ovaries . . . .  Otherwise, the CT scan of the abdomen and pelvis was essentially unremarkable."  (*Id.*)  The notes also indicated that Genao's thyroid was also normal.  (*Id.*)

On March 5, 2007, a lab test revealed that the gastric emptying study was abnormal and Genao's ability to empty her bowels was delayed.  (Ex. 20F at 20.)  On April 19, 2007, Genao was hospitalized for severe abdominal pain, vomiting and nausea.  (Ex. 16F at 7.)  Hospital notes from her visit included, "[t]his test came back still abnormal but with a significantly lesser degree of abnormality than the baseline examination which was done as an outpatient on no prokinetic agents."  (*Id.* at 2.)

On July 2, 2007, Genao was hospitalized again.  (Ex. 17F at 7.)  The doctors suspected Inflammatory Bowel Disease was the source of her pain.  (*Id.* at 9.)  Yet, it was not clear if her condition was caused by Crohn's Disease or ulcerative colitis.  (*Id.*)  She was hospitalized on two more occasions from August 2007 until January 2008.  (Ex. 17F at 1; 18F at 1.)

Genao underwent several more lab tests in 2008 and 2009 due to her myriad of health problems.  (Ex. 19F 2-4; Ex. 26F at 7; Ex. 28F 15-16.)  Her results from an MRI came back normal.  (Ex. 26F at 7.)  A cervical spine MRI revealed "[c]entral disc herniation . . . causing mild central canal stenosis. There is no cord impingement," and is "otherwise unremarkable." (Ex. 28F at 15.)  And a C Spine Trauma revealed a normal alignment of Genao's cervical spine with "no acute fracture of the cervical spine."  (Ex. 28F at 16.)

Finally, Genao visited Dr. Lichtbroun on April 28, 2009 for sleep apnea.  (Ex. 25F at 1.) During his examination, Dr. Lichtbroun did a physical examination of Genao and noted that she is able to touch "six inches to the floor without pain, deep knee bends without pain."  (Ex. 25F at 2.)  She has a full range of motion in her neck and shoulder.  (Ex. 25F at 2.)  Genao "has all 18 tender points of fibromyalgia but is tender diffusely."  (*Id.*)  There are no reflexes of her knees and ankles, (*id.*), and "[p]ositive straight leg raising on the right with pain at the lateral hip and trochanter."  (*Id.*)  There is "[m]arked tenderness of the right iliac wing and trochanter especially if she adducts her right hip fully."  (*Id.*)  Lastly, "[t]he x-ray of the right hip was completely normal."  (*Id.*)  Genao claims Dr. Lichtbroun diagnosed her with fibromyalgia.  (Tr. 5.)

**C.**     **Daily Activities and Residual Functional Capacity**

Genao's day begins with taking a shower and doing some work around the house.  (Ex. 7E at 1.)  She then goes over to her mother's house.  (*Id.*)  Genao spends the day at her mother's house, watches television, eats dinner with her family and then drives back to her own house. (Ex. 5E at 1; Ex. 7E at 1; Ex. 10E at 1.)  The record contains inconsistencies regarding whether Genao drives to her mother's house or is driven there by someone else.  (Ex. 7E at 4; Ex. 10E at 1.)  After she returns home, Genao takes another shower in the evening.  (Ex. 7E at 1.)

Genao feeds her pets and gives them a bath.  (Ex. 5E at 2; Ex. 7E at 2.)  It takes her about

three hours to do the laundry.  (Ex. 7E at 3.)  She also cleans around the house and can do chores for up to two hours.  (*Id*.)  Genao goes shopping for clothes, personal hygiene products and food and usually shops about two times every month.  (Ex. 5E at 4.)  She is able to prepare her own meals on a daily basis and it usually takes her about an hour to prepare her meals.  (Ex. 7E at 3.)  She can watch television, talk on the phone and read.  (Ex. 7E at 4-5.)  Genao visits her family regularly and is able to attend church on Sundays.  (Ex. 7E at 5.)  Lastly, in 2007 Genao's mother reported that she was able to walk for a couple of blocks without needing to rest.  (Ex. 5E at 6.)  However, in a 2008 function report, Genao mentions that she can walk one block but needs to rest for ten to fifteen minutes.  (Ex. 10E at 6.)

In her Development Summary report, it was determined that Genao was not prevented "from returning to her [past relevant work] as she describes it and as it is customarily performed in the national economy."  (Ex. 21F at 3.)  Furthermore, according to the Residual Functional Capacity ("RFC") assessment, Genao is able to occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours during an eight-hour work-day, sit with normal breaks for about six hours and do unlimited pushing and pulling.  (Ex. 22F at 2.)  She is able to climb stairs and ramps, balance, stoop, kneel, crouch and crawl frequently.  (Ex. 22F at 3.)  There are no manipulative, visual or communicative limitations; however, some environmental limitations exist, including avoiding all hazardous conditions.  (Ex. 22F at 4-5.)

**LEGAL STANDARD**

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence

"does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 Fed. Appx. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 Fed. Appx. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because we would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). The court is required to give substantial weight and deference to the ALJ's findings. *Scott v. Astrue*, 297 Fed. Appx. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 Fed. Appx. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir.

9

1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D.Pa. 1976)).  Indeed, a

decision to "award benefits should be made only when the administrative record of the case has

been fully developed and when substantial evidence on the record as a whole indicates that the

claimant is disabled and entitled to benefits."  *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d

Cir. 1984).

**DISCUSSION**

An individual will be considered disabled under the Act if he or she is unable to "engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment" lasting continuously for at least twelve months.  42 U.S.C. § 423(d)(1)(A).  The

physical or mental impairment must be severe enough to render the individual "not only unable

to do his previous work but [unable], considering his age, education, and work experience, [to]

engage in any other kind of substantial gainful work which exists in the national economy. . . ."

§ 423(d)(2)(A).  Subjective complaints of pain, alone, cannot establish disability.  *Id.*  Instead, a

claimant must show that the "medical signs and findings" related to her ailment have been

"established by medically accepted clinical or laboratory diagnostic techniques, which show the

existence of a medical impairment that results from anatomical, physiological, or psychological

abnormalities which could reasonably be expected to produce the pain or other symptoms

alleged . . . ."  *Id.*

The Social Security Administration (the "SSA") utilizes a five-step sequential analysis to

determine disability.  *Cruz*, 244 Fed. Appx. at 480 (citing 20 C.F.R. § 404.1520 (a)(4)(i)-(v)).

"A negative conclusion at steps one, two, four or five precludes a finding of disability."  *Id.*

However, "[a]n affirmative answer at steps one, two or four leads to the next step.  An

affirmative answer at steps three or five results in a finding of disability." *Id.* (citing § 404.1520 (a)(4)(i)- (v)) (internal quotations omitted).

> The Supreme Court describes the evaluation process as follows:
>
> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work.  In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.  If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry.  If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps.  At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience.  If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990); see also 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The burden of persuasion lies with the claimant in the first four steps.  *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 763 (3d Cir. 2009).  Once the claimant is able to show that the impairment prevents him from performing his past work the burden shifts to the Commissioner to demonstrate "that the claimant still retains a residual functional capacity to perform some alternative, substantial, gainful activity present in the national economy." *Id.* (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)).

In the instant case, Genao argues the ALJ'S decision is not supported by substantial evidence for the following reasons: (1) the ALJ erred at step two by failing to consider all of Genao's severe impairments;  (2) the ALJ erred at step three by failing to combine and compare all of Genao's medical ailments; (3) the ALJ's credibility finding was unfounded; (4) the ALJ erred in his RFC determination; and (5) the ALJ erred in finding that Genao was able to perform her past relevant work.  For the reasons expressed below, this Court affirms the ALJ's decision because substantial evidence supports the ALJ's findings.

**Steps One and Two**

First, the ALJ must determine whether the Plaintiff is, at the time of filing, engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 416.920(a)(4)(i).  SGA is work that involves significant physical or mental activities and done for pay or profit.  20 C.F.R. § 416.972(a)-(b). The ALJ determined that Genao has not engaged in SGA since November 5, 2006.

Under step two, the question is whether claimant has an impairment that significantly affects her ability to work.  20 C.F.R. § 416.920(c).   Genao argues the ALJ's step two analysis was erroneous because he did not credit Genao for all her severe impairments, which included fibromyalgia, thyroid, depression, asthma, sleep apnea, migraine headaches and syncope.  (Pl.'s Br. 17-24.)

In *Salles v. Commissioner of Social Security*, 229 Fed. Appx. 140, 145 n.2 (3rd Cir. 2007),  the Third Circuit noted that "[b]ecause the ALJ found in [claimant's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless."  See also *Rivera v. Comm'r of Soc. Sec.*, 164 Fed. Appx. 260, 262 n.2 (3d Cir. 2006); see also *Portorreal v. Astrue*, No. C.A. 07-296ML, 2008 WL 4681636, at *4 (D.R.I. Oct. 21, 2008); see also *Ross v. Astrue*, No. 08-5282, 2010 WL 777398, at *5 (D.N.J. Mar. 8, 2010).  Indeed, the ALJ found that Genao suffered from certain severe impairments, namely, gastritis, seizure disorder and neck disorder, and by finding in Genao's favor, the ALJ's decision is sound.

The Court also finds the ALJ did consider evidence of Genao's ailments, including ailments that Genao did not claim as a basis for her disability.  The ALJ reviewed Genao's medical record and discussed Genao's fibromyalgia, thyroid, depression, asthma, sleep apnea and syncope.  Additionally, Genao never based her disability claims on depression and sleep

apnea but claimed disability due to asthma, epilepsy, gastrointenstinal problems, thyroid and high blood pressure. She failed to claim disability benefits for the ailments she asserts the ALJ did not consider. (Ex. 1E at 2.) In spite of Genao's inconsistent claims, the ALJ reviewed all of her conditions and her medications. For this reason, we find that the ALJ properly evaluated Genao's ailments to determine if she had any severe impairment.

**Step Three**

At step three, the ALJ is required to "compare the claimant's medical evidence to a list of impairments presumed severe enough to preclude any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 376, 379 (3d Cir. 2004). The Third Circuit states in dicta that this contention is "an argument which is entirely dependent upon the merits of [claimant's] argument that the ALJ erred at Step Two." *Salles*, 229 Fed. Appx. at 145. In *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 120 (3d Cir. 2000), the Third Circuit required the ALJ to "fully develop the record and explain his findings at step three," and to explain why all of claimant's impairments when combined do not meet or equal the listed impairments. *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Padilla v. Comm'r of Soc. Sec.*, No. 09-2897, 2010 WL 2346650, at *5 (D.N.J. June 9, 2010) (citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Instead, the Third Circuit advises us to consider the ALJ's decision in its entirety to determine whether the ALJ considered all relevant factors at step three. *Padilla,* 2010 WL 2346650, at *5.

Here, the ALJ enumerated specific listings concerning epilepsy, digestive systems and Genao's "diagnosed musculoskeletal disorders of the spine . . . ." (ALJ's Decision at 8.) As he identified the relevant listings, the ALJ mentioned why Genao's impairments did not meet each listing's respective requirements. Therefore, there is substantial evidence to support the ALJ's

determination that Genao's severe impairments do not equal listing-level impairments.  See *Burnett*, 220 F.3d at 119.  Furthermore, Genao never specifies how her impairments meet the listings.  See *Cosby v. Comm'r of Soc. Sec.*, 231 Fed. Appx. 140, 146 (3d Cir. 2007) (affirming denial of Plaintiff's appeal where she failed to "argue or even suggest which listing the ALJ should have applied, nor [did] she point to any medical evidence ignored by the ALJ that would show that [her] impairments medically equaled one of the listings.").

The ALJ considered all of Genao's impairments that were enumerated in her application. The ALJ even went a step further by considering other impairments that Genao claimed well after she filed for disability benefits, including medical problems that were only raised during the ALJ hearing.[2]  After comparing the ALJ's explanation to the facts in the record and comparing Genao's medical diagnoses against the listings, it is clear that Genao did not satisfy one or more elements required to meet or equal a listed impairment even when her conditions are combined. For this reason, this Court finds no basis to reject the ALJ's finding at step three.

**Step Four**

If there is not substantial evidence to find Plaintiff disabled under one of the medical impairments, the ALJ continues the analysis to determine whether Plaintiff can perform her past employment based on her residual functional capacity. 20 C.F.R. § 416.920(e). The residual functional capacity looks at all of the relevant medical and other evidence in the case record and measures by what work, if any, Plaintiff is able to perform based on her mental and physical limitations.  *Id.*

First, the ALJ must determine whether Plaintiff is suffering from a medically determinable physical or mental impairment. 20 C.F.R. § 416.920(a)(4)(ii).  Second, the ALJ

---

[2] We note that the ALJ mentioned all but one condition, which was Genao's migraine headaches.

must determine the extent that the impairment limits Plaintiff's ability to work.  *Id.* at (f).
Finally, the ALJ must look at Plaintiff's employment prior to her disability claim and determine
whether she is able to perform that same work despite her impairment.  See generally, 20 C.F.R.
§ 416.920(g).

Generally, the "ALJ is under an obligation to give 'great weight to a claimant's
subjective testimony of the inability to perform even light or sedentary work when this testimony
is supported by competent medical evidence.'"  *Bryan v. Comm'r of Soc. Sec.*, No. 09-2430,
2010 WL 2222493, at *150 (3d Cir. 2010) (quoting *Schaudeck v. Comm'r of Soc. Sec. Admin.*,
181 F.3d 429, 433 (3d Cir. 1999)).  The Third Circuit has established the standard for evaluating
subjective complaints, referring us to the Social Security Regulations.  *Caruso*, 99 Fed. Appx. at
380.  The Social Security Ruling ("SSR") 96-7p provides:

> The purpose of this Ruling is to clarify when the evaluation of symptoms,
> including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the
> credibility of an individual's statements about pain or other symptom(s) and its
> functional effects; to explain the factors to be considered in assessing the
> credibility of the individual's statements about symptoms; and to state the
> importance of explaining the reasons for the finding about the credibility of the
> individual's statements in the disability determination or decision.

Plaintiff's subjective complaints "may not be discredited on the basis of the ALJ's own
medical judgment; it must be discredited by contradictory medical evidence."  *Cruz*, 244 Fed.
Appx. at 481(quoting *Kent*, 710 F.2d at 115).  If there are inconsistencies in the evidence, the
ALJ must mention and analyze the contradictory evidence that tends to discredit the claimant.
*Burnett*, 220 F.3d at 122; see also *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).
"Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that
some or all of the claimant's testimony about her limitations or symptoms is less than fully
credible."  *Salles*, 229 Fed. Appx. at 146.  The ALJ must not only express which evidence he

15

relies on to support his decision, but he "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121 (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). "Although allegations of pain and other subjective complaints must be consistent with objective medical evidence, the ALJ must still explain why he is rejecting the testimony." *Burnett*, 220 F.3d at 122 (internal citations omitted). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

In this case, we agree with the ALJ that Genao's subjective complaints are contradicted by evidence in the record. The ALJ pointed to several contradictions in the subjective testimony and the medical record. (ALJ's Decision at 10.) First, the ALJ noted that Genao's medical record shows her condition improved during her hospital visits and that many of her lab results were normal. Second, the ALJ compared Genao's subjective testimony regarding her ability to work against the medical opinion by Dr. Grochowalski, Genao's treating physician. Dr. Grochowalski opined that he did not know of any limitations that would prevent Genao from being able to work or to carry out her daily activities. (ALJ's Decision at 10; Ex. 23F at 8.) Genao testified that she does not "have complete motion of [her] neck towards [her] left side" due to the herniated disc. (Tr. 19.) By contrast, Dr. Lichtbroun's physical examination showed that she did not have the limitations Genao testified to at her hearing. (Ex. 25F at 2.)

Furthermore, as the ALJ correctly pointed out, Genao alleges that her medical conditions severely restrict her ability to carry out daily activities; however, she filled out reports attesting to the opposite. (Pl.'s Br. 31-32; Ex. 5E; Ex. 7E) In two function reports, she noted that she is able to take a shower, take care of some work around her house, drive to and from her mother's

house, have dinner by herself, manage the laundry most of the time and even prepare meals for herself.  (Ex. 7E; Ex. 10E at 1.)  There are certain activities that Genao is able to carry out on a daily basis such as feed her pets, give her pets a bath, talk on the phone, watch television and go to her mother's house daily.  (Ex. 5E at 2, 5; Ex. 7E at 2-5.)

Lastly, Genao claims that due to her severe impairments she no longer possesses a valid driver's license.  (Pl.'s Br. 36.)  Yet, during the ALJ's cross-examination, Genao was asked whether she had a valid driver's license at the time of her hearing, and whether it had ever been revoked.  (Tr. 22.)  Genao responded that she still possessed a license and her driving privileges had never been revoked.  (Tr. 22.)  This assertion certainly illustrates the inconsistencies in Genao's testimony and lends further support to the ALJ's adverse credibility determination.  The ALJ acknowledged that "the claimant has suffered from a medically determinable 'severe' impairment." (ALJ's Decision at 10.)  However, he found that Genao's "allegations are not supported by the objective evidence in the record to the degree claimed . . . [and] this restriction appears to be self imposed . . . ."  *Id.*

As stated above, once the ALJ determines the extent that the impairments limit Plaintiff's ability to work, the ALJ makes an RFC determination to decide what a plaintiff "can do despite his limitations."  *Nkrumah v. Comm'r of Soc. Sec.*, 60 Fed. Appx. 378, 380 (3d Cir. 2003).  To make a determination, the administrative record serves as the "touchstone for determining which limitations should be included in an RFC assessment."  *Salles*, 229 Fed. Appx. at 148.  The ALJ is required to "only include in the RFC those limitations which he finds to be credible . . . [t]hus, to the extent that he found some of [Genao's] alleged limitations less than credible, the ALJ properly excluded them from the RFC."  *Id.* at 147.  Unless there is

relevant medical evidence to the contrary, this Court will not hold that the ALJ erred in his RFC

assessment.  See *Caruso*, 99 Fed. Appx. at 380.

      Here, the ALJ determined that Genao was able to "perform work that involves lifting and

carrying objects weighing up to 20 pounds, frequently lifting and carrying objects weighing up to

10 pounds; standing, walking, and sitting up to six hours in an eight-hour work day; pushing and

pulling arm and leg controls; and the full range of light work."  (ALJ's Decision at 11.)  The ALJ

did acknowledge that Genao's severe impairments preclude her from carrying out medium work,

but that she was still able to perform light work.  In making his determination, the ALJ gave

great weight to her treating physician opinion and expert medical opinion by the state agency

medical consultants who reviewed Genao's medical record.  In challenging the ALJ's finding,

Genao argues that substantial evidence does not support this finding.  However, Genao has the

burden to prove that she lacks sufficient RFC to perform her past relevant work.  *Nkrumah*, 60

Fed. Appx. at 381.  There is substantial evidence to support the ALJ's determination as to

Genao's RFC.

      Contrary to Genao's claim that the ALJ failed to compare Genao's past work duties on a

task-by-task basis, the ALJ undertook a comprehensive review of Genao's record.  Furthermore,

the ALJ acknowledged that Genao faces constraints due to her severe impairments, but

determined that her restrictions are not serious enough to prevent her from performing her past

relevant work as a head distribution clerk.

      Interestingly, Genao insists that because her physicians have warned her against using

hazardous machinery, the ALJ erred in finding that Genao could perform her past work as a head

distribution clerk at Coca Cola where she had to operate hazardous machinery, namely an

automobile.  (Pl.'s Br. 36.)  This argument lacks any merit. Genao's attempt to categorize cars as

18

hazardous machinery goes beyond the intended definition of "hazards."  SSR 96-9p defines hazards as "moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals."  As we mentioned at the outset, the burden is on the plaintiff to demonstrate that limitations exist to her ability to perform her past relevant work.  Genao has not met her burden of production.  Based on the evidence on the record, we find the ALJ's determination at step four was appropriate.

**CONCLUSION**

For the foregoing reasons, the Court holds that substantial evidence supports the ALJ's decision.  Accordingly, the Court **affirms** the judgment of the ALJ.


<u>s/Susan D. Wigenton</u>
U.S.D.J.

Orig:       Clerk
Cc:        Parties